548 F.2d 1232
 9 ERC 1937, 7 Envtl. L. Rep. 20,294
 UNITED STATES of America, Plaintiff-Appellee,
v.
UNITED STATES STEEL CORPORATION, Defendant-Appellee,
United Steelworkers of America, AFL-CIO, et al., Movants-Appellants.
Honorable George C. WALLACE, as Governor of the State of
Alabama, Petitioner,
v.
UNITED STATES of America et al., Respondents.
UNITED STEELWORKERS OF AMERICA, AFL-CIO, et al., Petitioners,
v.
UNITED STATES of America et al., Respondents.
 Nos. 76-2754, 76-2771 and 76-2827.
 United States Court of Appeals,
Fifth Circuit.
 March 18, 1977.
 
 John C. Falkenberry, Jerome A. Cooper, Birmingham, Ala., for United Steelworkers of America, AFL-CIO, and others.
 Wallace H. Johnson, Asst. Atty. Gen., Dept. of Justice, Walter Kiechel, Jr., Deputy Asst. Atty. Gen., Martin Green, Bradford F. Whitman, Washington, D. C., for the United States in No. 76-2754.
 Robert G. Tate, William Foster, Birmingham, Ala., for U. S. Steel Corp.
 Raymond W. Mushal, Atty., Pollution Control Sect., Land & Nat. Res. Div., Edmund B. Clark, Chief, Appellate Sec., Peter R. Taft, Asst. Atty. Gen., Land & Nat. Res. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee in No. 76-2754 and respondents in Nos. 76-2771 and 76-2827.
 Maurice F. Bishop, Gerald D. Colvin, Jr., Birmingham, Ala., for petitioner in No. 76-2771.
 Wayman G. Sherrer, U. S. Atty., Birmingham, Ala., for the United States in Nos. 76-2754, 76-2771 and 76-2827.
 Russell E. Train, Administrator, E. P. A., Washington, D. C., Edward H. Levi, U. S. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Alfred T. Ghiorzi, Chief, Pollution Control Sect., Washington, D. C., for respondents in Nos. 76-2771 and 76-2827.
 Appeal from the United States District Court for the Northern District of Alabama.
 Petitions for Review of an Order of the Environmental Protection Agency (Alabama Cases).
 Before GEWIN, GEE and FAY, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 In this consolidated appeal,[1] the United Steelworkers of America, AFL-CIO (the Union) and Governor George C. Wallace, in his capacity as chief executive officer of the State of Alabama (the Governor) dispute an Environmental Protection Agency's (EPA) order closing United States Steel's last two operating open hearth furnaces in Birmingham, Alabama. The Union appeals the federal district court's denial of its motion to intervene as a matter of right under Fed.R.Civ.P. 24(a)(2) in United States v. United States Steel Corp. The Governor, seconded by the Union, directly petitions this court for review of the EPA's denial of his application pursuant to § 110(f)(1) of the Clean Air Act, 42 U.S.C. § 1857c-5(f)(1) (1970)[2] for postponement of the closing of the two furnaces. We believe the district court correctly denied intervention to the Union and dismiss for want of jurisdiction, see United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826, 841 (5th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). We likewise believe the EPA correctly determined that the Governor's request for postponement was untimely.
 
 UNION'S ATTEMPT TO INTERVENE
 
 2
 On May 31, 1972, in accordance with the Clean Air Act, the EPA approved the Alabama implementation plan, Alabama Air Pollution Control Regulations, Chapter 4.4.1, which defined certain air quality standards for the State of Alabama in general and for Birmingham, Alabama, in particular. Under the plan sources of pollution were allowed three years to reduce emissions to prescribed standards. United States Steel originally operated twenty-one open-hearth furnaces twelve at its Fairfield plant and nine at its nearby Ensley plant incapable of meeting the plan's standards without the addition of expensive anti-pollution equipment. The corporation sought to comply with the air quality standards by shutting down the open hearth furnaces and replacing them with modern Q-BOP furnaces. By May 31, 1975 the compliance date two Q-BOP furnaces had replaced the twelve Fairfield open hearth furnaces, but five open hearth furnaces still operated at Ensley in violation of the state plan.
 
 
 3
 Three months earlier, in February of 1975, the EPA had warned United States Steel that the emissions from the Ensley furnaces violated the implementation plan and that they must be brought into compliance by May 31, 1975. Conceding that it could not meet the deadline in time because of delays in construction of a third Q-BOP plant, U.S. Steel entered into negotiations with EPA in April, and in May reached an agreement. On June 9, 1975, nine days after the deadline had expired, the EPA filed an enforcement action under § 113 of the Act, 42 U.S.C. § 1857c-8 (1970).[3] On the same day the parties filed for the court's approval the May 1975 agreement, cast in the form of a consent decree, under which the EPA allowed U.S. Steel to operate three of the old furnaces until January 1, 1976, two until July 1, 1976, and none after that date. The district court declined to approve the consent decree in its order in the belief that only the EPA had power to grant a 13-month extension, but on July 23, 1975, it did enter an order that all five open hearth furnaces be closed by June 30, 1976.[4]
 
 
 4
 Two other features of the consent decree are material. In exchange for the 13-month extension of compliance with the state clean air standards, U.S. Steel surrendered its right to seek additional judicial extension of the June 30, 1976, deadline and further waived any right to judicial review of any future determination by the EPA pursuant to the decree. It retained the right to ask EPA for modification or extension of the June 30, 1976 deadline, but any modification or extension was to be in the sole discretion of EPA. U.S. Steel complied with the consent decree, but on May 21, 1976, it sought an additional postponement until December 31, 1977, when the new Q-BOP furnace was to be on line. On June 16, the EPA denied the postponement. The next day, Union sought to intervene in the district court in the suit between U.S. Steel and the EPA filed almost a year earlier. On June 23, 1976, the district court denied intervention for the Union's failure to meet the requirements of Fed.R.Civ.P. 24(a). From this denial the Union appeals.
 
 
 5
 The Union sought intervention as a matter of right under Fed.R.Civ.P. 24(a) (2).[5] To establish this right, the Union was required to (1) file a timely application for intervention, (2) show an interest in the subject matter of the action and that disposition of the action without intervention would, as a practical matter, impair or impede its ability to protect that interest, and (3) establish that its interest was not adequately represented by the existing parties. See Fed.R.Civ.P. 24(a)(2); United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826, 841 (5th Cir. 1975). The district court concluded that the Union's attempt to intervene was untimely and that the Union's interests were adequately represented by U.S. Steel. We agree.
 
 
 6
 The question of timeliness lies within the district court's discretion, which may be reversed only upon a showing of abuse: timeliness is not limited to chronological considerations, it "is to be determined from all the circumstances." NAACP v. New York, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973). Here the EPA filed its enforcement suit on June 9, 1975, the district court entered its order on June 23, 1975, but the Union did not seek to intervene until June 17, 1976, after the EPA had denied U.S. Steel's request for another extension. The district court did not abuse its discretion in finding the Union's attempt at intervention untimely: its June 23, 1975, order was a final judgment, and we have noted that intervention attempts after final judgments are "ordinarily looked upon with a jaundiced eye." McDonald v. E. J. Lavino Co., 430 F.2d 1065, 1072 (5th Cir. 1970). Interventions after judgment have a strong tendency to prejudice existing parties to the litigation or to interfere substantially with the orderly process of the court. Id. In this case the EPA had negotiated a settlement dispensing U.S. Steel from compliance with the Alabama implementation plan for 13 months in return for U.S. Steel's agreement to not seek judicial review of the consent decree, forestalling any court challenge by U.S. Steel that might have delayed compliance. The Union was aware of the proposed consent decree and had been given an opportunity to comment upon it.[6] Further, as soon as the EPA filed its enforcement action the Union could have sought intervention. It is too late for the Union to intervene to challenge the consent decree: EPA would lose its bargain and suffer prejudice to its attempt to effect the Alabama implementation plan.
 
 
 7
 The Union argues that its intervention was timely because it relied on the EPA's agreement, in the consent decree, to entertain information and requests from U.S. Steel concerning modification or extension of the consent decree and because it mistakenly believed that EPA would again extend the compliance deadline. Only when the EPA denied the extension did the Union realize, it avers, that extension was not certain. We agree with the trial court that Union's reliance was misplaced; the consent decree cannot be read to promise further extensions. Even were we to accept the Union's argument as explaining the delay, prejudice to the parties would still exist because, as the Union concedes, it was aware of the consent decree from the first yet slept on its rights and took no action to assert its interest.[7]
 
 
 8
 Nor has the Union shown that its interests were not adequately protected by U.S. Steel. Representation is adequate "if no collusion is shown between the representative and an opposing party, if the representative does not have or represent an interest adverse to the proposed intervenor and if the representative does not fail in the fulfillment of his duty." Martin v. Kalvar Corp., 411 F.2d 552, 553 (5th Cir. 1969) (per curiam). Implying no collusion between U.S. Steel and the EPA, the Union yet asserts that it has different and stronger interests from those of U.S. Steel, suggesting that U.S. Steel's interest in keeping the furnaces open could have flagged if it became profitable to close them. Noting that the Union had made no complaint about U.S. Steel's representation, the district court found that the interests of the Union and U.S. Steel were identical. We cannot fault the district court's judgment, especially in light of the Union's forbearance from intervention in the argument between the EPA and U.S. Steel until after the twelfth hour. Such inaction is mute testimony to the Union's reliance upon U.S. Steel to protect its interests.
 
 
 9
 On these considerations,[8] we agree that the district court properly denied the Union's motion to intervene in United States v. United States Steel, No. 76-2754. Because a district court's proper denial of intervention is not a final judgment, see United States v. Allegheny-Ludlum Industries, Inc., 517 F.2d 826, 841 (5th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); United States v. Allegheny-Ludlum Industries, Inc., 546 F.2d 1249, 1251 (5th Cir. 1977), we dismiss the Union's appeal for want of jurisdiction.
 
 
 10
 GOVERNOR WALLACE'S ATTEMPT TO POSTPONE IMPLEMENTATION
 
 
 11
 The Governor of Alabama and the Union petition this court for direct review of the EPA's denial of the Governor's request to postpone implementation. See 42 U.S.C. § 1857c-5(f)(2)(B) (1970). Under Section 110(f)(2)(B) we have limited jurisdiction to review an Administrator's determination whether to grant a governor's request for postponement. The postponement provision delineates a narrow set of circumstances in which a governor may request postponement of application of an implementation plan to a source of pollution. The Administrator determined that the Governor's request failed to meet these circumstances in that the Governor filed an untimely request for postponement. We affirm the Administrator's determination.
 
 
 12
 Section 110(f)(1) of the Clean Air Act, 42 U.S.C. § 1857c-5(f)(1) (1970),[9] allows the governor of a state to request of the EPA a postponement of the applicability of any requirement of a state implementation plan, provided the request precedes the date on which a source of pollution is required to meet the requirement. Congress vested this power to request a postponement solely with the Governor, thus reducing the number of pleas for postponement from affected parties.
 
 
 13
 In this case U.S. Steel was required to comply with the state implementation plan on May 31, 1975. The Governor made no request for postponement of any requirement of this plan until June 24, 1976, six days before the plants were to close.[10] The EPA denied the postponement request as untimely, parenthetically remarking that even if it had been timely the Administrator would still have denied the request.[11] The Governor, joined by the Union, protests that the consent decree postponed the application of requirements under the implementation plan, so that any request made before June 30, 1976, the time when the consent decree required U.S. Steel to close the plants, was timely. Accordingly, the Governor and the Union challenge the EPA's denial of postponement without notice or a hearing. We cannot accept petitioners' view of § 110(f)(1) and agree with the Administrator that the Governor's request was untimely.
 
 
 14
 The statute cannot be so read to support the petitioners' position: on May 31, 1975, U.S. Steel should have complied with the state implementation plan. By its terms, § 110(f)(1) of the Clean Air Act requires the Governor to seek postponement "(P)rior to the date on which any stationary source . . . is required to comply with any requirement of an applicable implementation plan . . . ." 42 U.S.C. § 1857c-5(f)(1) (1970). The Governor should have requested postponement prior to that date, but instead he acted on June 24, 1976, thirteen months after the proper time. Because the State of Alabama did not revise its plan pursuant to § 110(a)(3) of the Clean Air Act, 42 U.S.C. § 1857c-5(a)(3) (1970), and because the Governor of Alabama did not seek postponement, only the EPA's forbearance on its enforcement action under § 113(b), 42 U.S.C. § 1857c-8(b) (1970), allowed U.S. Steel to continue operating the furnaces. The EPA wants authority to absolve U.S. Steel from the requirements of the Alabama implementation plan. It can only delay enforcement.[12] The statute is clear: when the state implementation plan deadline passes, the Governor has no power to seek a postponement. Thus, the EPA properly determined not to entertain the postponement request.[13] We hold that the EPA, both factually and legally, correctly determined that the Governor's petition for postponement was not timely filed.
 
 CONCLUSION
 
 15
 The logical party to this appeal, U.S. Steel, is not before us, having swapped its right to judicial review for thirteen months of open-hearth furnace operation. U.S. Steel's sacrifice of judicial review proved prophetic in that we find no other grounds for appellate jurisdiction in the Union's case. This is not a situation in which a statute fails to provide for judicial review when judicial review of agency action is clearly proper, see Ortego v. Weinberger, 516 F.2d 1005 (5th Cir. 1975). Instead, the one party who could have invoked judicial review waived that right and in the context of this case the Union has no colorable claim. Similarly, the Governor's belated action in seeking postponement came too late, and the EPA properly determined the petition's untimeliness. We dismiss the Union's appeal in United States v. United States Steel and affirm the EPA's action on the petitions of the Governor and the Union.
 
 
 
 [1]
 For the purposes of this appeal, the court consolidated three cases: United States v. United States Steel Corp., No. 76-2754; George C. Wallace (as Governor of the State of Alabama) v. United States, No. 76-2771; and United Steelworkers of America, AFL-CIO, v. United States, No. 76-2827
 
 
 [2]
 (f)(1) Prior to the date on which any stationary source . . . is required to comply with any requirement of an applicable implementation plan the Governor of the State to which such plan applies may apply to the Administrator to postpone the application of such requirement to such source (or class) for not more than one year
 42 U.S.C. § 1857c-5(f)(1) (1970).
 
 
 [3]
 (a)(1) Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any requirement of an applicable implementation plan, the Administrator shall notify the person in violation of the plan and the State in which the plan applies of such finding. If such violation extends beyond the 30th day after the date of the Administrator's notification, the Administrator may issue an order requiring such person to comply with the requirements of such plan or he may bring a civil action in accordance with subsection (b) of this section
 (b) The Administrator may commence a civil action for appropriate relief, including a permanent or temporary injunction, whenever any person
 (1) violates or fails or refuses to comply with any order issued under subsection (a) of this section; or
 (2) violates any requirements of an applicable implementation plan (A) during any period of Federally assumed enforcement, or (B) more than 30 days after having been notified by the Administrator under subsection (a)(1) of this section of a finding that such person is violating such requirement;
 42 U.S.C. § 1857c-8 (1970).
 
 
 [4]
 The district court also retained jurisdiction for one year "for the purpose of receiving petitions, if necessary, from either of the parties in connection with the agreement between the parties. . . ." Appendix pp. 9-10
 
 
 [5]
 (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties
 Fed.R.Civ.P. 24(a)(2).
 
 
 [6]
 The terms of the proposed consent decree were published for comment in the Federal Register on June 20, 1975, and the Union made no comments. Union officials did testify, however, at a public hearing to discuss the proposed decree held prior to the decree's entry
 
 
 [7]
 This fact, along with the Union's long delay in seeking intervention, distinguishes the implicit finding of timeliness in United States v. Allegheny-Ludlum Industries, 517 F.2d 826 (5th Cir. 1975), a case relied on by the Union. In Allegheny-Ludlum, the intervenors had no opportunity to participate in the negotiations leading to the consent decree between the EEOC and the Justice Department on one side and the companies and the Union on the other. Here the Union had an opportunity to comment on the proposed consent decree and to testify on the proposal at a public hearing. More importantly, however, the intervenors in Allegheny-Ludlum filed their motion soon after the entry of the consent decree, but here the Union delayed until the last moment
 
 
 [8]
 The EPA also argues that denial of intervention was proper because the interests that the Union sought to protect the job security and welfare of U.S. Steel employees at the open hearth furnaces are not the type of interests cognizable in a Clean Air Act § 113 enforcement action. Our affirmance of the district court on other grounds causes us to pretermit this question, but we note in passing that the Union in its reply brief also lodged a substantive challenge to the data on particulate emissions relied upon by the EPA for enforcement
 
 
 [9]
 See note 2, supra
 
 
 [10]
 The Governor's failure to request a postponement prior to May 31, 1975, is understandable since at that time the State of Alabama was suing U.S. Steel to force its compliance with the State plan
 
 
 [11]
 Even if a Governor makes a timely request, under § 110(f)(1), to grant it the Administrator must first determine that:
 (A) good faith efforts have been made to comply with such requirement before such date,
 (B) such source (or class) is unable to comply with such requirement because the necessary technology or other alternative methods of control are not available or have not been available for a sufficient period of time,
 (C) any available alternative operating procedures and interim control measures have reduced or will reduce the impact of such source on public health, and
 (D) the continued operation of such source is essential to national security or to the public health or welfare,
 42 U.S.C. § 1857c-5(f)(1) (1970).
 
 
 [12]
 Cf. District of Columbia v. Train, 533 F.2d 1250, 1254-55 (D.C.Cir. 1975). (In context of compliance by federal facilities to state plans, Consent Agreement is an extrastatutory device not affecting state implementation plans)
 
 
 [13]
 The EPA also argues that § 110(f)(1) only allows a single one-year postponement upon a governor's request, so that in this case even if the EPA accepted the request it could do no good. The Supreme Court has remarked, however, that the § 110(f) is susceptible to an interpretation that a governor may request and receive successive one-year postponements. See Train v. Natural Resources Defense Council, 421 U.S. 60, 85 n. 21, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). In that case the Supreme Court found it unnecessary to decide that question, and our disposition pretermits this question also